## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **ANDRE DWAIN TAYLOR**, | **2:24-cv-12540-TGB-CI** |
| Petitioner, | HON. TERRENCE G. BERG |
| vs. | |
| **NOAH NAGY,** | **OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY** |
| Respondent. | |

Andre Dwain Taylor filed this Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his Wayne County Circuit Court conviction of three counts of third-degree criminal sexual conduct and one count of assault with intent to commit sexual penetration. The Petition raises a single claim: Taylor's trial attorney rendered ineffective assistance of counsel by advising him not to testify at trial. Because the state courts did not unreasonably apply established Supreme Court law in denying the claim, the Petition will be **DENIED**.

## I. BACKGROUND

### A. Introduction

The charges against Taylor arose from an encounter with a waitress he met at a bar in Southfield. The young woman claimed that Taylor

choked and raped her at her apartment after he gave her a ride home from work. Taylor told police that the two engaged in consensual sex.

Taylor's attorney advised him not to testify at trial, and Taylor chose to follow that advice. As a result, the trial court ruled that Taylor could not present the affirmative defense of consent, and the jury would not be instructed on consent. Moreover, the jury only heard the complainant's version of the incident. Taylor's defense counsel explained at a state post-conviction hearing that she nevertheless advised Taylor not to testify because she was able to assert the functional equivalent of a consent defense by challenging the element that "force or coercion" was used to accomplish sexual penetration. Counsel explained that if Taylor had testified, then the prosecution would have impeached him and strengthened its case with inculpatory statements he made to police that the jury would not otherwise hear. Counsel also believed that she had effectively undermined the victim's credibility on cross-examination and by way of a defense expert. After some back-and-forth in the state courts, the Michigan Court of Appeals ultimately rejected Taylor's claim and found that his defense counsel made a reasonable strategic decision given the particular facts of the case.

The focus on federal habeas review is the reasonableness rather than the correctness of the state court's decision. Given the evidence presented at trial and at the state post-conviction hearing, the Court

finds that the state court reasonably found that counsel did not perform deficiently.

### B. Trial Evidence

The primary evidence presented against Taylor at trial was the testimony of the complainant, Bria Hunt. Hunt testified that she was twenty-one years old on November 28, 2017, the date of the incident. ECF No. 9-8, PageID.545. She lived in an apartment in Detroit and worked as a server at Bar Seven in Southfield. *Id.* at PageID.545–46.

Taylor was a regular at the bar, and he was there that evening. *Id.* at PageID.547–48. Taylor bought Hunt two shots of tequila during her shift, and the two briefly talked during the course of the evening. *Id.* at PageID.549–50. Hunt did not have any discussion with Taylor about having sex with him later, nor was she interested. *Id.* at PageID.550. Hunt had also smoked marijuana that evening to help her get through her shift, something she often did. *Id.* at PageID.551.

Hunt did not have a car. She usually used Uber to get to work and had the manager drive her home. *Id.* at PageID.551–52. That night, however, Taylor offered to give Hunt a ride home after the bar closed. *Id.* at PageID.552. Hunt was not concerned because Taylor seemed nice, and he told her that he wasn't interested in having sex. *Id.* at PageID.553.

Before going home, Hunt went with Taylor to a nearby gas station to buy "rellos," an item used to smoke marijuana. Taylor paid for them,

3

which Hunt thought was nice. *Id.* at PageID.554–56. She did not see if Taylor purchased anything for himself. *Id.* There was no discussion about having sex, and in fact, Hunt knew that it would not be a concern because they had previously discussed it. *Id.* at PageID.556.

Taylor then drove Hunt to her apartment, less than ten minutes away. *Id.* at PageID.557. The two sat in the car and briefly talked about Hunt's artwork. *Id.* Taylor suggested that he come up to the apartment to see her paintings. *Id.* at PageID.558. Hunt told him it was fine, "but, I didn't want to chill for long, because I was tired." *Id.*

Hunt's apartment was sparsely furnished. She had a mattress on the living room floor, a table with a television, her paintings on the floor, and little else. *Id.* at PageID.558–59. Hunt "rolled up some weed to smoke," and the two sat on Hunt's mattress. *Id.* Hunt testified that she had anxiety and depression, and she smoked the marijuana because it helped her cope. *Id.* at PageID.559–60. Hunt stated that she planned to show Taylor her artwork and then go to sleep. *Id.* at PageID.559.

As they sat on the mattress looking at her paintings, Taylor put his arm around Hunt. *Id.* at PageID.560. Hunt felt uncomfortable "because [Taylor] stated that we weren't going to do anything like that." *Id.* at PageID.560–61. Hunt tried to move Taylor's hands and move away from him on the bed. *Id.* at PageID.561.

Taylor persisted and then tried to pull Hunt on top of him. *Id.* Hunt told him to stop and tried to get up, but Taylor pulled her down. *Id.* at PageID.562–63. Taylor took off Hunt's head scarf, and he told her how nice her hair was and how pretty she was. *Id.* at PageID.563–64. Hunt was uncomfortable and frustrated and again asked Taylor to stop. *Id.* at PageID.565–66. Taylor, however, did not stop and managed to remove all of Hunt's clothes and then took off his own. *Id.* at PageID.566.

Taylor got on his knees and put his penis near Hunt's mouth, but she kept her mouth closed. *Id.* at PageID.566–68. Taylor then managed to get on top of Hunt and put his penis in her vagina. *Id.* at PageID.568. She "verbally and physically" indicated to him that she did not want to have sex. *Id.* She unsuccessfully tried to push him off her and move his hands. *Id.* at PageID.569.

Taylor opened a condom and tried to put it on, and Hunt grabbed it and ripped it because she thought it might stop him from assaulting her. *Id.* at PageID.572–73. Taylor replied, "why would you do that," put on another condom, and put his penis in her vagina. *Id.* at PageID.573. Taylor held down Hunt's arms. *Id.* at PageID.574. He also choked her "more than once" with his hand pressing down on her neck, "like squeezing, pressing down." *Id.* at PageID.574–76. Hunt could barely breathe. *Id.* She tried to grab his arms, but she was unable to stop him. *Id.* Taylor finally stopped after Hunt assumed he had ejaculated. *Id.* at

PageID.576–77. Taylor then laid down next to Hunt. *Id.* at PageID.578. Hunt was upset, frustrated, and stressed, so she started to smoke marijuana again. *Id.*

Hunt explained that during this episode she didn't call out for help because "I just wasn't thinking." ECF No. 9-9, at PageID.592. She testified that she was in shock, and she "was just scattered and stressed out." *Id.* at PageID.719. Instead, she sat on the edge of her bed and smoked while Taylor laid there. *Id.* at PageID.592.

Taylor then pulled Hunt back down and started to assault her again. *Id.* at PageID.593–94. Hunt told him to stop more than once and tried to pull away, but Taylor was able to put his penis in her vagina again. *Id.* at PageID.593–95. Tayor pulled her by the back of her hair and choked her again. *Id.* at PageID.595–96. Hunt's neck hurt and it was hard for her to breathe. *Id.* The second assault ended after Hunt felt ejaculate on her stomach and legs. *Id.* at PageID.597–98. Hunt tried to hit Taylor with her asthma breathing machine, but Taylor grabbed it. *Id.* at PageID.599–600.

Hunt got out of bed and got a rag out of her closet to wipe herself off. Taylor also used the rag. *Id.* at PageID.601–02. Taylor told Hunt that her struggling had only made him want to do it more. *Id.* at PageID.602–03. So, when Taylor proceeded to choke and penetrate her vagina a third time, Hunt struggled a little less. *Id.* at PageID.603–04.

6

After the last assault, Taylor dozed off. Hunt got dressed and looked for her phone. *Id.* at PageID.605. She stepped outside her apartment and into the hallway. She was "embarrassed and nervous…. I didn't know if I wanted to do anything. I didn't know many people over there." *Id.* at PageID.605–06. Hunt testified that she didn't feel comfortable calling the police, and she didn't want the attention. *Id.* at PageID.606. In any event, when she pressed the button on her phone, the battery died. *Id.*

Taylor came outside and got Hunt to go back inside. *Id.* at PageID.606–07. He gathered his things, kissed her on the forehead, and left. *Id.* at PageID.607, 684–85. Hunt thought it was about 5:00 a.m. *Id.* She believed the whole episode lasted from about 2:30 to 5:00 a.m. *Id.*

Hunt went back inside her apartment, let her cat out of the bathroom, and laid down. *Id.* at PageID.607. Hunt plugged in her phone and cried a little. *Id.* at PageID.608. She messaged her mom with an upset face emoji. *Id.* She also messaged a friend and thought about whether she should go to the hospital. *Id.* at PageID.608–09.

It was about 8:00 a.m. when Hunt managed to fall asleep. *Id.* at PageID.609. When she woke up later that day, she spoke with her mom and texted with her friend about what had happened. *Id.* at PageID.609–11. Her friend urged her to go to the police or to the hospital. *Id.*

Hunt wasn't sure if she wanted to be taken anywhere. "I wasn't comfortable. I didn't really want to talk about it … to a stranger, and I

7

didn't know if I wanted to go to the police station." *Id.* at PageID.611–12. Eventually, Hunt agreed to have her friend drive her to the police station. *Id.* The friend picked her up around 3:00 p.m. and drove her to the Southfield Police Station. *Id.* She was told that she was at the wrong place and needed to go to the Detroit Police Station. *Id.* at PageID.613. Because Hunt didn't "fully" want to go anyway, she had her friend drive her home instead. *Id.* at PageID.613–14.

Hunt spoke with her mom later that evening, and her mom urged her to go to the hospital. *Id.* at PageID.618. Hunt agreed, and her mom picked her up and drove her to Beaumont Hospital around 9:00 p.m. *Id.* at PageID.618–19. They waited there for about four or five hours before being seen. *Id.* at PageID.620–21. After Hunt was brought back, she was told that they did not perform rape kits at that facility, and they were sent to Sinai-Grace Hospital. *Id.*

A sexual assault examination was finally performed at Sinai-Grace Hospital, and Hunt told a nurse everything that had happened. *Id.* at PageID.621–23. Photos of Hunt taken during the examination were admitted into evidence. *Id.*

The day after the incident Hunt spoke with a security guard at work and her manager in the hope of having Taylor banned from the bar, but the bar was unwilling to ban him. *Id.* at PageID.625–26. Hunt then

received messages from Taylor accusing her of lying and telling people about what happened. *Id.* at PageID.633–34.

Hunt went to her therapist later that week, and based on the therapist's recommendation, she went to the psychiatric unit at University of Michigan Hospital. *Id.* at PageID.627–30. A few days later she was released and went to stay at her parents' house. *Id.* at PageID.632. She didn't want to go back to her apartment because Taylor knew where she lived. *Id.* at PageID.632–33. Hunt also didn't really want to move back to her parents' home because she thought she had been doing well out on her own. *Id.* Hunt lived at home for months and never returned to work at Bar Seven. *Id.* at PageID.633–35.

Defense counsel attacked Hunt's account of the incident and her credibility during a lengthy cross-examination:

- <u>Counsel suggested that Hunt did things indicating that she voluntarily had sex with Taylor.</u> Hunt denied that she untied her shirt herself after Taylor was having trouble doing so. ECF No. 9-9, PageID.660. Hunt agreed that she mostly used the word "sex" instead of word "rape" in her statement. *Id.* at PageID.668–69, 81-82. Hunt admitted to letting Taylor know that she was not wearing a bra at work, though she denied winking at him. *Id.* at PageID.638–39. Hunt admitted that she went into the store with Taylor and that the condoms were kept behind the counter, suggesting that she knew Taylor bought condoms on the way to her apartment. *Id.* at PageID.640–41. Hunt admitted that she invited Taylor up to her apartment, and that he did not beg her to do so, contrary to her direct examination testimony. *Id.* at PageID.642.

- <u>Counsel suggested that Hunt lied about being choked or being forced to have sex.</u> Hunt admitted that she smoked weed after the assault though she said the choking made it hard for her to breathe. *Id.* at PageID.661. Hunt admitted that she told police that she was choked nine times, suggesting she fabricated an unreasonably large number given a lack of injuries. *Id.* at PageID.667–68. Hunt admitted that the photo from her exam did not show two bruises, whereas she described Taylor using two hands to choke her. *Id.* at PageID.649. Hunt admitted that there were no bruises on her arms despite her testimony that he grabbed her there. *Id.* at PageID.656. Hunt described Taylor squeezing her face, but she acknowledged that there were no bruises on her face. *Id.* at PageID.696.

- <u>Counsel offered an alternative explanation that the bruising on Hunt's neck could have resulted from a hickey rather than choking, and Hunt admitted that Taylor kissed her and sucked on her neck. *Id.* at PageID.649–50.</u>

- <u>Counsel suggested that if Hunt had been assaulted, then she would have sought immediate help.</u> Hunt admitted that she was not restrained by Taylor, she was not tied down, she was "free to run out the door," or she could have reached for her phone, but she did not do any of those things. *Id.* at PageID.648, 655, 658, 666. Hunt admitted that between assaults she went to a different room to get a towel and then came back to bed instead of leaving her apartment. *Id.* at PageID.669–70. Hunt admitted that there were ten or so neighboring apartments, but she never yelled for help. *Id.* at PageID.643. Hunt admitted that she went out of her apartment after the third rape but didn't seek help. *Id.* at PageID.682. Hunt admitted that nothing kept her from running or knocking on someone's door when she went outside. *Id.* Hunt admitted that she was more comfortable going back inside with Taylor—someone she said raped her— than she was seeking help from a stranger. *Id.* at PageID.683. Hunt admitted that Taylor didn't force her back into her

apartment. *Id.* at PageID.684. Hunt admitted that Taylor kissed her on her forehead when he left. *Id.* at PageID.684–85. Counsel suggested that it was unreasonable to believe that Hunt felt more comfortable returning to her rapist than to seek help just because she was not familiar with the area and did not feel safe. *Id.* at PageID.706–07.

- Counsel suggested that Hunt failed to turn over evidence to the police. Hunt admitted that she didn't give her shirt, rag, linens, or the used or ripped condoms to the police. *Id.* at PageID.645–46, 648, 664, 670, 688–89.

- Counsel challenged Hunt on the differences in the details between her description of the assaults at trial and her statement to the nurse and her preliminary examination testimony. This included challenges to her description of how Taylor choked her and being raped four times instead of three. *Id.* at PageID.648–49, 650, 652–54, 657, 660–61, 663–64, 671. Hunt was challenged on the details regarding her use of the breathing machine to attack Taylor. *Id.* at PageID.697–99. Hunt was challenged on her prior statement that she bit Taylor on his shoulder, arms, and hands. *Id.* at PageID.667, 671–72, 704. Hunt was challenged with her statement that Taylor never got off the bed between first and second assaults. *Id.* at PageID.705–06.

- Counsel challenged Hunt's credibility based on her lack of recall of the details of the assault. Counsel suggested that it was not credible that Hunt was able to give a detailed description of Taylor in the police report but not recall certain details of the incident. *Id.* at PageID.700–01.

- Counsel challenged Hunt regarding her drug use. Hunt admitted to alcohol and drug use on the day of the incident. *Id.* at PageID.637–38. Counsel suggested Hunt had a serious drug abuse problem by having her acknowledge her use of alcohol, weed, "molly," and cocaine. *Id.* at PageID.674, 678–79. Counsel impeached Hunt's testimony denying cocaine use

11

the day before the incident with her preliminary exam testimony. *Id.* at PageID.680–81. Counsel elicited a concession from Hunt that she "chose to self-medicate with cocaine, molly, marijuana, and alcohol." *Id.* at PageID.704.

- <u>Counsel suggested that Hunt was not honestly afraid of Taylor after the incident.</u> Hunt admitted that she texted her mother that she just wanted to sleep in her own bed, though testified that she was afraid to go to her apartment. *Id.* at PageID.712.

- <u>Counsel elicited testimony from Hunt regarding her serious mental health challenges at the time of the assault.</u> Hunt admitted that her friend had committed suicide a week before the incident. *Id.* at PageID.675. Hunt admitted that she had a mood disorder. *Id.* at PageID.676–77. Hunt admitted that she was suicidal prior to the incident. *Id.* Hunt admitted that she was depressed and anxious on the night of incident. *Id.* Hunt admitted that she messaged someone a week before the incident that she wanted to jump off a building. *Id.* at PageID.681. Hunt described herself as being bi-polar, having mood swings, being suicidal, being agitated easily, and having self-conscious feelings prior to Taylor coming over. *Id.* at PageID.681–82. Hunt admitted that she did not tell Taylor about any of these problems. *Id.*

- <u>Counsel suggested that it was Hunt's sense of embarrassment at work and/or her desire to get back at Taylor for not asking for her phone number that caused her to falsely accuse him.</u> Hunt admitted that she was embarrassed and didn't want people at work to know what had happened. *Id.* at PageID.685–86. Hunt acknowledged that Taylor was never banned from the bar. *Id.* Hunt admitted that she was upset that she couldn't go back to work and had to quit. *Id.* at PageID.686–87. Hunt admitted that she texted Taylor that she was holding on to the rag to use it against him. *Id.* at PageID.687–88. Hunt admitted that she argued via text with Taylor after the incident. *Id.* at PageID.689 ("Were you

12

arguing back with him, and don't [get] into what the message that he said, but were you arguing back with him about what he was saying to you?"); *id.* at PageID.691 ("He sent you several messages, asking you why you were lying about … saying you had been raped?"); *id.* at PageID.690 ("You would agree that Mr. Taylor was messaging you, disputing the allegation that you were raped by him, correct?"). Hunt agreed that Taylor never once agreed to her version of events. *Id.* at PageID.691. Hunt admitted that she was embarrassed that people at work knew. *Id.* Hunt admitted that she possibly asked for money from someone to pay her rent after the incident. *Id.* at PageID.708–09. Counsel suggested that Hunt falsely accused Taylor of rape in a bid for sympathy, questioning her regarding a text stating "maybe I'll go to the police station, or hospital, or something. I have to do something, I can't go to work and see him there, and be able to work. So, I have to do something." *Id.* at PageID.713. Counsel suggested that Hunt was embarrassed that she let Taylor have sex with her without getting her phone number. *Id.* at PageID.714. Hunt admitted that she needed a police report about the assault to terminate her lease early. *Id.* at PageID.731.

- <u>Counsel suggested that Hunt's delay in going to the police undermined her credibility.</u> Hunt admitted that she was released from U of M Hospital on December 4th, but she didn't go to police until December 11th. *Id.* at PageID.710. Hunt admitted that at the preliminary exam she said she didn't go to the police because she needed a ride from her mom even though she had a phone and could have called the police. *Id.* at PageID.711–12. Hunt admitted that she texted someone, "If I go make a police report, what do I tell them?" suggesting that she made up the details of the assault. *Id.* at PageID.714–15.

Bria Hunt's mother, Heather Hunt (hereinafter "Mrs. Hunt"), testified that her daughter informed her of the assault in the evening the day after the incident. *Id.* at PageID.743–45. She drove Hunt to the hospital. *Id.* at PageID.745. Mrs. Hunt knew her daughter was upset, as she showed it by curling up and making herself "small." *Id.* at PageID.746. Mrs. Hunt saw the bruising on her daughter's neck. *Id.* at PageID.748.

On cross-examination, Mrs. Hunt testified that her daughter apologized to her, texting that she was "so sorry she always screws things up." *Id.* at PageID.752. Mrs. Hunt had to convince her to go to the hospital. *Id.* at PageID.753, 757. Her daughter messaged her, "I don't want to go to the ER. I just want to forget it and go home." *Id.* at PageID.757. Mrs. Hunt admitted that she was baffled why her daughter didn't call 9-1-1 after the assault. *Id.* at PageID.755. Mrs. Hunt thought that maybe Hunt didn't want her dad to know what had happened. *Id.* at PageID.756, 761. Hunt was at U of M Hospital from November 30th to December 4th. *Id.* at PageID.759. Mrs. Hunt didn't remember why it took until December 11th for her daughter to finally go to the police. *Id.*

Nancy Mihalik, a mental health professional, conducted the intake examination for Hunt at her therapist's office months prior to the incident. *Id.* at PageID.768. Hunt was diagnosed with "major moderate depression disorder." *Id.* at PageID.771. She did not have bipolar

disorder. *Id.* On cross-examination, Mihalik testified that the intake exam also indicated that Hunt had impaired impulse control and impaired judgment. *Id.* at PageID.775, 779.

Forensic scientist Jennifer Morgan testified that she did genetic testing on samples taken from Hunt's rape kit. Her statistical model indicated that it was five hundred and ten octillion times more likely that the DNA found in the kit came from Taylor than from someone else. *Id.* at PageID.793–811. Another forensic scientist, Melanie Morse, testified about the swab locations used to take the samples. *Id.* at PageID.818–24.

Detroit Police Seargent Jose Ortiz testified that police received a report of the incident from SAFE on December 11, 2017. *Id.* at PageID.844. On cross exam, Ortiz testified that another detective had unsuccessfully tried to contact Hunt on November 29th. *Id.* at PageID.844–45. Ortiz also testified about the extensive problems he had getting the friend Hunt communicated with on the day after the assault to come in to testify. *Id.* at PageID.848–49.

That friend, Robert Mangham, testified as a reluctant witness. ECF No. 9-26, PageID.3971.[1] Mangham testified regarding the text exchange he had with Hunt the morning after the incident and about taking her to the police station. It turned out that he had never met Hunt in person

---

[1]    There was a delay in the transcription of the testimony of the next three trial witnesses. *See* ECF No. 9-26, PageID.3961–63. The testimony of these three witnesses appears out of place in the record and is located as part of the Michigan Court of Appeals record. *Id.* PageID.3964 ff.

before, and that they had only been "Facebook Friends." Hunt told Mangham that she was choked and raped. On cross-examination, Mangham acknowledged that Hunt told him that she had made a "bad decision" and had money problems. *Id.* at PageID.3971–91.

Lisa Doetsch testified that she was the sexual assault nurse examiner ("SANE") who examined Hunt at the hospital. Hunt told Doetsch that she had been sexually assaulted and choked multiple times. Hunt also told her that she tried to fight Taylor off by scratching his chest, biting him, pushing him off her, and attempting to choke him with the cord of her breathing machine. Doetsch photographed bruises on the victim's neck. The bruises were consistent with being choked but not with a "hickey." *Id.* at PageID.4050–77.

Kathleen Donoghue testified that she was Hunt's therapist. *Id.* at PageID.3994–95. In the months prior to the date of the incident, Hunt sought treatment for mild depression. *Id.* at PageID.3997. Hunt was generally stable. *Id.* at PageID.4001. That continued to be the case through her November 16, 2017, appointment. *Id.* at PageID.4006.

Donoghue testified that when she saw Hunt at her next appointment on November 30, 2017:

> … I witnessed or observed a significant change in her affect and mood…. She was very guarded meaning she wasn't making a lot of eye contact with me, closed off body language, not very verbal with me when I was asking questions to start off the session and she appeared as though something was

16

very wrong coming into the session. She presented a lot differently than she ever had.

*\*\*\**

It took Bria a while to come out and say anything to me which is pretty typical, and she stated that someone had assaulted her and that she had not really been able to sleep and was feeling actively potentially suicidal or at risk to herself.

*Id.* at PageID.4008–09. Donoghue testified that Hunt was reexperiencing symptoms related to the assault that were replaying in her mind. *Id.* at PageID.4035. Donoghue had Hunt's mother join the session and directed her to drive Hunt to the hospital because she was suicidal. *Id.* at PageID.4012.

Breanna O'Keefe, a certified sexual assault forensics examiner, testified for the defense as an expert witness. ECF No. 9-10, at PageID.858. O'Keefe reviewed the records in the case but did not interview or examine Hunt. *Id.* at PageID.865–68. She testified to various problems with the investigation. She criticized the failure of medical providers to perform a complete strangulation assessment. There was nothing documented to show that Hunt's eyelids were inverted to check for petechiae. Nor did it appear that Hunt's ears were evaluated to see if blood vessels were ruptured. Similarly, examiners did not look in Hunt's throat or under her tongue for evidence of strangulation. O'Keefe also noted that the SANE examiner opined that the bruise on Hunt's neck was caused by choking, but if that were the case then proper

care would have required a CAT scan to determine whether there was a brain injury. *Id.* at PageID.868–70.

O'Keefe reviewed the photos and read Hunt's statement. *Id.* at PageID.871. She opined that the photos did not support Hunt's description of how she was choked, *id.* at PageID.872–73, as there was no bruising in the photos where you would expect it. *Id.* at PageID.874–75. O'Keefe testified that there is no way to determine whether what the photo showed was a bruise or a hickey, and to her it looked more like a hickey. *Id.* at PageID.875–77.

O'Keefe testified that the photos showed abrasions on Hunt's arms, but they looked like they were older than the 22 hours that elapsed between the incident and the photos. *Id.* at PageID.877–78. O'Keefe opined that it is possible to observe injuries in a vaginal exam after consensual intercourse. *Id.* at PageID.878–79. But O'Keefe did not see any such injury on Hunt. *Id.* In O'Keefe's opinion, it would have been more likely for Hunt to have suffered injuries to her vagina based on her description of squirming and resisting during multiple incidents. *Id.* at PageID.879–81. O'Keefe testified that the medical report was inconsistent with Hunt's description of the incident. *Id.* at PageID.882–83. Furthermore, the report tried to incorrectly differentiate between a hickey and bruise, when there was no way to do so. *Id.* at PageID.884–85.

### C. Waiver of the Right to Testify

This was the state of the evidence when defense counsel was faced with the final decision whether to advise Taylor to testify in his own defense. The trial court repeatedly informed defense counsel and Taylor that if he did not testify, then he would not be able to present a consent defense to the jury, and the jury would not be instructed on a consent defense. ECF No. 9-26, PageID.4048; ECF No. 9-11, PageID.913–22.

The court conducted an extensive colloquy with Taylor about his right to testify in his own defense. After informing the court that he had decided not to testify, the court warned Taylor, "you understand that if you do not testify, that your lawyer will not be able to argue that this sex, that occurred between you and [the victim], was consensual, do you understand that? ... She will not be able to make any arguments, whatsoever, that this sex was consensual, you understand that?" *Id.* at PageID.913–15.

The court and counsel then engaged in a discussion concerning the evidence that had already been admitted at trial, and the court rejected the argument that there had been evidence to show consent. *Id.* at PageID.916–20. The court instructed Taylor and his counsel to take further time to discuss the decision whether to testify in light of its ruling. After discussing the matter further with defense counsel off the record, Taylor affirmed his decision not to testify. The trial court stated that it

19

would be removing the jury instruction on consent. *Id.* at PageID.916–22, 923–27.

### D. Closing Argument, Instructions, and Verdict

During closing argument, defense counsel attacked Hunt's credibility and her account of the incident on the grounds raised during her cross-examination of the witnesses and based on the defense expert's testimony. While counsel never used the word "consent," she asserted that the evidence showed that Taylor did not use force or coercion to engage in sex with Hunt, a required element of the offense. ECF No. 9-11, PageID.991 ("But there still, there has to be force or coercion, for element number one").

Indeed, in instructing the jury on the elements of first-degree criminal sexual conduct, the trial court stated that the predicate assault "must have been against Bria Hunt's will." *Id.* at PageID.1021. The court further instructed the jury that the "prosecutor must also prove that the defendant used force or coercion. Force or coercion means that the defendant either used physical force or did something to make Bria Hunt reasonably afraid of present or future danger." *Id.* at PageID.1023.

With respect to the lesser offense of third-degree criminal sexual conduct, the court instructed the jury that

> … the alleged sexual act occurred under circumstances that involved force or coercion. Force or coercion means that the defendant either used physical force, or did something to make Bria Hunt reasonably afraid of present or future

danger. It is enough force if the defendant overcame Bria
Hunt, by physical force. It is enough force if the defendant
threatened to use physical force on Bria Hunt, and Bria Hunt
believed that the defendant had the ability to carry out those
threats. It is enough force if the defendant threatened to get
even with Bria Hunt in the future, and Bria Hunt believed
that the defendant had the ability to carry out those threats.
It is enough force if the defendant -- if the defendant used
force to induce the victim to submit to a sexual act, or to seize
control of the victim, in a manner facilitating commission of
the sexual act, without regard to the victim's wishes.

*Id.* at PageID.1024–25.

On April 25, 2019, the jury acquitted Taylor of the first-degree
charges and instead convicted him of three counts of the lesser charge of
third-degree criminal sexual conduct and one count of assault with intent
to commit criminal sexual conduct. ECF No. 9-12, PageID.1053. The trial
court subsequently sentenced Taylor on June 6, 2019 to three concurrent
terms of 3 to 15 years' imprisonment for the sexual conduct convictions
and 5 years' probation for the assault conviction. ECF No. 9-14,
PageID.1132–33.

### E. Post-Conviction Hearing

Shortly before sentencing, Taylor retained his present counsel. New
counsel filed a motion for bond pending appeal and a motion for new trial.
ECF No. 1, PageID.3. The trial court granted the motion for bond,

keeping Taylor out of prison,[2] and it ordered an evidentiary hearing on Taylor's claim that his trial counsel was ineffective for advising him not to testify. *Id.*

### 1. Taylor's written statement to police

Central to the issue presented at the state post-conviction hearing was Taylor's February 20, 2018, hand-written statement to police.[3] It was the contents of Taylor's statement, and the fact that the prosecutor could use it to impeach his testimony on cross-examination, that led trial counsel not to call him as a defense witness.

In his statement to the police, Taylor indicated he was forty-three years old. ECF No. 27-1, PageID.5346. He frequented Bar Seven six to seven days a week for the past eight years. *Id.* PageID.5350. He knew Hunt as someone who worked at the bar. *Id.* She needed a ride home the night of the incident and wanted weed. Taylor wrote that he offered to give her a ride home and to buy her the weed. *Id.*

On the way to the apartment Taylor said they stopped at a store where he bought condoms. He wrote that Hunt did not come into the store

---

[2]   Taylor was still free on a state appeal bond when he filed the present action. This Court denied Taylor's motion for bond pending a decision in this case. ECF No. 20. It appears Taylor's state appeal bond expired, and he started serving his sentence in December 2024.

[3]   A copy of the statement was filed after the initial Rule 5 submission, and it can be found at ECF No. 27-1. The questioning officer wrote down questions on a form, and then Taylor wrote down answers in his own handwriting. ECF No. 9-24, PageID.1254.

with him. He stated that he was not sure whether Hunt saw the condoms when he came back to the car (though he believed she did), but Hunt didn't say anything. ECF No. 27-1, PageID.5352.

Taylor was unable to buy Hunt the weed because his friend did not answer. *Id.* When they arrived at Hunt's apartment, Taylor suggested in his statement that he was the one who asked Hunt if he could come upstairs: "I parked my car and said I'm going to come up with you and she OK." *Id.*

Taylor explained that he "bought condoms because if we were to have sex, I wanted protection." *Id.* at PageID.5353. He didn't think Hunt wanted sex when he bought them, but he "was just being cautious." *Id.* Taylor next confusingly wrote that he "didn't have any intentions when I dropped Bria off at home. My intention was to have sex with Bria." *Id.* Taylor felt like Hunt liked him. *Id.*

Taylor asked Hunt if her vagina "was mine," and Hunt said "yes." *Id.* at PageID.5354. Taylor wrote that they had sex two times. *Id.* He said "[w]e had sex in several different positions. The sex was not rough we had sex in different positions. And it was in the middle between gentle and rough." *Id.* at PageID.5355. He wrote that Hunt never indicated to him that she did not want to have sex. *Id.*

When asked by the officer about "erotic asphyxiation," Taylor wrote, "I don't practice erotic asphyxiation. I did have my hand around

Bria's neck but it was just sexual and I wasn't choking her to the point where she wasn't breathing or even close. I was rushing through hair. I was telling her how beautiful she was. I told that I love exchanging energy with her." *Id.* Taylor wrote that "I put my hand around Bria's neck around 3 times." *Id.* But he explained that "[t]here was no point where I thought Bria could not breathe." *Id.* When asked why Hunt had bruises on her neck, Taylor wrote, "I don't know why there was bruises on Bria's neck. I did have my hand around her neck but not hard enough to make marks." *Id.* at PageID.5357.

Taylor never described in his statement putting a hickey on Hunt's neck or sucking on her neck. Rather, he described merely kissing her neck before having sex: "We talked about her painting and other things. I started to kiss her on her neck and started unknotting her shirt." *Id.* at PageID.5350.

### 2. Trial counsel Kirsten Irey-Iverson's testimony

Taylor's trial counsel, Kirsten Irey-Iverson, testified first at Hunt's May 17, 2021 post-conviction hearing. Trial counsel testified that she was retained by Taylor and handled his case from the preliminary exam through trial. ECF No. 9-24, PageID.1188–89. Trial counsel was aware of Taylor's written statement to police. *Id.* at PageID.1195. In her view the statement presented a mixed bag. "There were good things in there and there were bad things in there." *Id.* at PageID.1196. The negatives

24

things included the fact that Taylor admitted to choking Hunt and contained other details that supported her credibility. *Id.* at PageID.1197. Trial counsel was aware that the prosecutor might admit Taylor's statement to prove that Taylor choked Hunt, but ultimately the prosecutor decided not to admit the statement in its case-in-chief. *Id.* at PageID.1196–97. To counter Hunt's testimony that Taylor choked her, trial counsel chose to have an expert testify that the bruises on Hunt's neck were hickeys and not from being choked. *Id.* at PageID.1198.

Trial counsel was well-aware that the court would not instruct the jury on consent without having Taylor testify. *Id.* Her strategy was to nevertheless present such a defense "without saying the word consent," by challenging Hunt's credibility that Taylor forced her to have sex. *Id.* at PageID.1199. In trial counsel's view, having Taylor not testify didn't "remove the defense, it removes the jury instruction. If you read the closing arguments, I believe that the defense of consent was presented fairly well." *Id.* at PageID.1212.

Taylor was consistent in telling his attorney that the sex had been consensual, and trial counsel believed him. *Id.* at PageID.1200–02. Trial counsel was concerned that Taylor's statement to the police admitted to putting his hands around Hunt's neck, and at the same time he denied that he practiced consensual erotic asphyxiation. *Id.* at PageID.1202–03. For trial counsel, this meant that "[h]e admitted to choking her in the

statement. I didn't think that was good." *Id.* at PageID.1205. She was concerned that this admission was how the prosecutor would get to first-degree criminal sexual conduct. *Id.* at PageID.1205–07.

Considering his statement to police and his statements to her, trial counsel had several discussions with Taylor about whether to testify. *Id.* at PageID.1209. She advised him not to testify, "but ultimately I indicated it was his choice." *Id.* at PageID.1210. She explained to Taylor that no consent defense would be presented if he did not testify, and that the jury would not hear his side of story. *Id.*

Nevertheless, trial counsel prepared Taylor to testify:

… Throughout the entire case we prepped him to testify. We went through all the issues and the hurdles of the entire case throughout the entire representation of him. There are several times he came into the office where we went over me grilling him on explanations for why these certain statements were and trying to have a full understanding or better explanation why because ultimately if he did testify then the consent instruction would come in. Those issues obviously were problematic.

*Id.* at PageID.1248.

On cross-examination, trial counsel confirmed that her strategy was to use consent as a defense without Taylor's testimony. *Id.* at PageID.1213. Her decision to advise Taylor not to testify was only strengthened after Hunt had testified. *Id.* at PageID.1214–15. Trial counsel made a three-page written list for Taylor about the "cons" of him testifying, and she reviewed it with him. *Id.* at PageID.1215–16.

26

Trial counsel testified extensively about the features of Taylor's statement that led her to advise him not to testify:

> In the statement he indicated that he went to the bar six to seven times a week for the last eight years. I felt that was an issue because now you're characterizing him to the jury that he is basically like a local drunk, that supported the prosecutor's argument, potentially. I'm not saying I believed this but what I thought were issues with the trial. You're an older man taking advantage of younger girls and then I wrote on there who has time to go to the bar six to seven times a week? I thought that posed a problem for the jury and that would have come out if he had testified. … That was one. Another one was that he offered to get her some weed. I thought that was an issue. I can't remember if it was something the Judge had said during—I believe I asked for a directed verdict and there was something along the lines of an issue with marijuana and it never came out. She never testified that he offered to get her some weed. … I thought it looked bad that he was, like, almost luring her in to get some weed. Like, hey, if you come with me I'll get you some weed. … So that never came in. I mean, all of these things that I am discussing are pros and cons were things that we were able to keep out.
>
> ***
>
> So there were other things like she had—in his statement he had mentioned painting. I believe that her testimony during the trial, it just didn't make sense that he wanted to come up at 2:00 in the morning to look at a painting. However, if he testified and this statement and he was questioned about that, it would actually justify—not justify but it would add to the credibility of what she indicated.
>
> ***
>
> … Not knowing where the store is was another one. I indicated that it reduces the argument, his awareness, and lack of details of, like, what his perception was that night.

27

That wasn't really that big of a deal. He does mention 'rillos. There was an issue regarding her going into the store and actually wanting some, like, Cigarillos to, like, smoke weed. And I put on there, you purchasing puts her in the store with you while purchasing the condoms. That was a really big issue because she had indicated she didn't know he was purchasing condoms and part of our argument was, well, you were in the store with him trying to get these 'rillos, you were in the store with him when he purchased these condoms. So I thought that was a good argument for him that she should have been aware that he was purchasing condoms.

*** 

… [S]o there was an issue regarding a statement, he had indicated that he only used one condom and then there were statements that there was sex twice, never had sex with no condom…. It just was—it was just inconsistent statements that I thought the way that we have the—the way that the trial had gone was favorable to him and had he testified it would have—some of the stuff would have corroborated what she said.

*** 

… Another one was he put in his statement that she didn't come into the store and I thought that was a problem because she had testified that she did so he actually by saying she didn't come into the store would have corroborated what she said at some point regarding not knowing whether or not the condoms were purchased. It kind of went back and forth because her testimony wasn't consistent either. And then he had indicated that she didn't see the condoms. Then I said that eliminates another reasonable doubt argument. He had made a statement that said I said I am going to come up with you. He made that statement. I believed that eliminated another reasonable doubt argument about the fact that it was her idea to let him up, which I thought was more of a consent, like she wanted him to come up. That was voluntary. Condoms I wrote why. I don't know why—I can't remember

28

what this was about. Assuming going to have sex. Oh, why did he buy the condoms? That shows that you're assuming that you are going to have sex with protection. I don't think that was that big of a deal, but I just literally wrote out everything. He had made statements, I wrote you didn't think she wanted sex. And so I felt that was very problematic because now you are acknowledging that she might not want sex which is a problem regarding consent.

***

… There was another statement that said no intentions, there was no intentions to have sex, and then I said that contradicted his, like, you were buying condoms but you didn't have any intentions to have sex, which I thought was problematic for the consent as well. The last page there's a few things that gets into the more details. He had made a statement that her vagina is mine. I felt that was problematic for the jury to hear because it shows some type of, like, control and dominion. There were some concerns that I had regarding the age gap, which, again, I never deferred from the fact that I believed it was consent. To this day I believed it was consensual sex. Like, I don't believe that he raped her. But we had to be real with the statements that he made and as an older man to a 20-year-old self say your vagina is mine I thought would be problematic. The jury might not like to hear that. Then it goes into the hand in the position and the choking on the other side of that admits to choking. So he didn't indicate that she didn't want the choking, but he admits to actually choking her, just not to the point where she passed out. The next thing I indicated is that they were talking about exchanging energy. When she testified she was kind of all over the place about certain things that I thought that the jury would just kind of look at her, like, what in the world is she talking about, almost like she was making up things. But he now in reality actually put in his statement that they talked about exchanging energy, which would have corroborated her statement. He indicated that he had his hands around her neck three times. I flat out wrote out not good.

29

***

Because the whole point was that we were trying to dispute that he did not choke her, which would have—the prosecutor was arguing like that was for the first-degree issue. And our expert was going to indicate that that—those bruises could be signs of hickeys. Which, you know, none of us were in the room other than the two of them so I truly believed that it could be hickeys. But him admitting to putting his hand around her neck I think would have corroborated the prosecutor's expert testimony indicating that they were bruises from choking.

***

So if he had indicated that it was asphyxiation—I can't say that word—asphyxiation, if he had said yes, then that would have essentially said that was the type of sexual act that they were performing and that was putting his hands on her throat was a part of role-play or however you want to…. If he had said yes, then it would have made sense why he put his hands around her neck because that was what they were doing that night. But the fact that he said no, I didn't know how to get around if you're not doing asphyxiation, how do you—you know what I mean, how do you explain why in the world your hands were around her neck and three times? And not to mention that there were bruises. The last couple things I wrote, distortion regarding being buzzed. I just put distortion of mentality. I don't—I think that was regarding her because she had said she had had a shot. I can't remember what this part was. And the last part was his criminal history. I know that he had some criminal history dealing with some grand theft auto out-of-state, and that would have been concerns regarding his truth and veracity.

*Id.* at PageID.1216–24.

Trial counsel also directed Taylor to make his own list about the pros and cons of testifying, and they talked about how to deal with the

30

issues at trial. *Id.* at PageID.1225–26. At the trial itself, before the final decision was made, trial counsel and Taylor had a discussion in the hallway along with Taylor's family members, and everyone—including Taylor—agreed that he should not testify. *Id.* at PageID.1231–33. According to trial counsel, it was Taylor's own decision not to testify, made with full knowledge that there would be no consent instruction. *Id.* at PageID.1233.

Without Taylor's testimony, trial counsel still thought it was very important to dispute the evidence that the marks on Hunt's neck were caused by choking, and so she did so by way of the defense expert. *Id.* at PageID.1233–34. In fact, trial counsel believed that her strategy resulted in Taylor being convicted of third-degree instead of first-degree sexual conduct because the prosecutor did not prove that Taylor choked Hunt. *Id.* at PageID.1234.

Trial counsel testified that despite the loss of the consent instruction, she was nevertheless able to present an effective closing argument:

> I was able to actually furnish—I'm not necessarily patting myself on the back, but I was able to, based on the testimony that Ms. Hunt gave, I thought she gave a lot of testimony that helped Mr. Taylor in showing that it was consent. I testified earlier that there were things such as she voluntarily got in the car with him, she voluntarily wanted him to come up to the apartment. There were things that she indicated that after he supposedly raped her, she sat on the bed and smoked weed. She never called for help, she never screamed out. He

> fell asleep, she got out of the apartment, she never ran away,
> she never called for help. I mean, her whole testimony in and
> of itself other than where she talked about that the sex was
> not consensual. I believed was favorable to him showing
> consent. I'm quite baffled with the jury's verdict.

*Id.* at PageID.1234–35.

Trial counsel further explained that Taylor's statement corroborated parts of Hunt's testimony, that standing alone, made her seem not credible:

> I didn't think him testifying would help anything because it
> would corroborate half the stuff that she looked like she was
> lying about or not telling the truth about. It made her look
> crazy. I say that in the sense of not like a psychologist but it
> didn't make her look credible at all. Quite frankly, after
> hearing the jury's verdict on guilty of CSC-3, I would make
> the same decision to not have him testify because ultimately
> I would have concerns that they would find him guilty of the
> CSC-1 had he testified to choking her.

*Id.* at PageID.1238–39.

Trial counsel also stated that a significant problem for Taylor was that his statement didn't mention giving Hunt a hickey. *Id.* at PageID.1243. Taylor told trial counsel that "he never sucked on her neck, and he never gave her a hickey." *Id.*

Trial counsel fully advised Taylor about the consequences of not testifying. She even "printed out a jury instruction of the consent instruction and gave him a copy of the consent instruction and we discussed it in my office. We also discussed it out in the hallway after the Court indicated that he would not be getting the instruction on the

record. We discussed it again and went through the instruction line by line out in the hallway." *Id.* at PageID.1246–47.

### 3. Taylor's testimony

Taylor also testified at the post-conviction hearing. But surprisingly, he wasn't questioned in much detail about the incident itself. Instead, without "going through every question and answer," counsel had Taylor simply confirm that the statement he gave to police was true. *Id.* at PageID.1253–54. Taylor testified that he "would have given similar answers as [he] gave on this written statement." *Id.* at PageID.1254, 1265.

Taylor testified that he told police that "we had sex in every position and if she considered it rough, I didn't—I didn't—I said it was between gentle and rough, like I wasn't trying to hurt her or anything. We was just having sex." *Id.* at PageID.1258. When asked why he denied performing erotic asphyxiation while admitted to putting his hands on Hunt's neck in his statement, Taylor explained, "It was just—it was just—when she said erotic asphyxiation, I was thinking about something that somebody is—that's what they do every time. I just had my hand around—on her neck in a sexual way. I wasn't choking her, I wasn't hurting her." *Id.* at PageID.1258–59.

Taylor testified that he told his trial counsel that he wanted to testify, and that is when trial counsel wrote out the "cons" list. *Id.* at

PageID.1261. Taylor acknowledged that trial counsel "advised me that Bria's testimony was so weak that I didn't have to testify because her testimony was so weak and inconsistent that the jury would see that." *Id.* at PageID.1262.

On cross-examination at the post-conviction hearing, Taylor testified that the bruising on Hunt's neck was not caused by his hands but by him putting a hickey on her neck. *Id.* at PageID.1266–67.

### 4. Trial court's opinion granting motion for new trial

The trial court granted the motion for new trial in a written opinion. ECF No. 9-26, PageID.1344–63. The court found that trial counsel had an "unsound view of the law." *Id.* at PageID.1356. It found that trial counsel's focus on disputing the allegation that Taylor strangled Hunt might have challenged an element of the first-degree charge, but "it did nothing to address the ultimate element of the charged offenses which was consent." *Id.* PageID.1357. The court found that nothing in the evidence indicated that Taylor and Hunt engaged in consensual sex:

> By advising and ostensibly convincing the Defendant that he did not need to testify in on his own behalf Ms. Irey Iverson deprived the Defendant of the ability to raise his only viable defense to allegations in this case consent.

*Id.* PageID.1361–62. The court found the advice was not the product of strategy but a product of a misunderstanding of the law as it relates to consent in a Criminal Sexual Conduct case. *Id.* PageID.1362. The court concluded that there is a reasonable probability the outcome of the

34

proceeding would have been more favorable to Taylor had the jury heard evidence consistent with his consent defense. *Id.*

### F. State Court Appeal

The prosecutor appealed, and the Michigan Court of Appeals initially reversed, finding that Taylor had not shown that he was prejudiced by his trial counsel's advice. *People v. Taylor*, No. 360535, 2023 WL 328326 (Mich. Ct. App. Jan. 19, 2023); ECF No. 9-26, PageID.1309–11.

Taylor appealed to the Michigan Supreme Court. That court reversed the decision of the Court of Appeals, finding that the Court of Appeals had mistakenly believed that the trial court reviewed the claim under *United States v. Cronic*, 466 U.S. 648 (1984), rather than *Strickland v. Washington*, 466 U.S. 668 (1984). The case was remanded back to the Court of Appeals. *People v. Taylor*, 511 Mich. 993 ( 2023) (Table).

On remand, the Michigan Court of Appeals found that Taylor had sufficiently demonstrated prejudice under *Strickland*. The Court, however, found that Taylor failed to demonstrate that trial counsel's performance was deficient, thus rejecting Taylor's claim on the first prong of the *Strickland* test. Specifically, the Court of Appeals found that trial counsel had made a reasonable decision to forgo the consent defense because counsel was still able to mount the functional equivalent by

challenging the element of force or coercion. The court noted that running an explicit consent defense required Taylor's testimony, which trial counsel believed would "do more harm than good" considering Taylor's statement to police. The court considered the fact that trial counsel called an expert witness to establish that the bruises on Hunt's neck were not caused by strangulation. The court found that trial counsel was otherwise able to adequately attack Hunt's credibility and present Taylor's defense during cross-examination. Finally, the court noted that there was a possibility that trial counsel's efforts to seed reasonable doubt by advising Taylor to testify might have been undermined if the jury found him not to be credible. *People v. Taylor*, No. 360535, 2023 WL 7455543 (Mich. Ct. App. Nov. 9, 2023); ECF No. 9-26, PageID.1312–18.

Taylor again sought leave to appeal in the Michigan Supreme Court, but the court denied his application for leave to appeal by form order over the dissent of one Justice. *People v. Taylor*, No. 166514, 10 N.W.3d 864 (Mich. Sept. 20, 2024) (Table).

## II. STANDARD OF REVIEW

Section 2254(d) of Title 28 of the United States Code limits federal habeas review of claims that were adjudicated on the merits by the state courts. A habeas petitioner must demonstrate that the state court adjudication was "contrary to" or "involved an unreasonable application of" clearly established Supreme Court law. A decision is "contrary to"

36

clearly established Supreme Court law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.

Under this standard a federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410–11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## III. ANALYSIS

### A. Cleary Established Supreme Court Standard

As it pertains to Taylor's sole claim on habeas for ineffective assistance of counsel, the Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684–85 (1984). To show this right was violated under *Strickland*, a defendant must establish that his counsel's

performance was deficient and that he was prejudiced by his counsel's deficient performance. *Id.* at 687–88.

When evaluating counsel's performance under *Strickland's* first prong, the reviewing court must apply a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. *Strickland's* prejudice prong requires the defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

According to the Supreme Court, "[t]he standards created by *Strickland* and § 2254 are both 'highly deferential,'" and "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (quoting *Knowles v Mirzayance*, 556 U.S. 111, 113 (2009)). "Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Richter*, 562 U.S. at 105. The question on habeas review "is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

## B. The State Court Applied the Correct Standard

The Michigan Court of Appeals correctly applied the *Strickland* standard. In setting out the standard of review, the state court quoted *People v. Randolph*, 917 N.W.2d 249, 252–53 (Mich. 2018), which accurately recited the *Strickland* standard. *People v. Taylor*, 2023 WL 7455543, at *2; ECF No. 9-26, PageID.1314.

Taylor asserts that the state court erred by subjecting his claim to the *Strickland* standard rather than applying the standard governing claims for the constructive denial of counsel under *United States v. Cronic*, 466 U.S. 648 (1984). ECF No. 21, PageID.5260–61.

"Ineffective assistance claims may be reviewed under *Strickland* or under *Cronic*." *See Moss v. Miniard*, 62 F.4th 1002, 1001 (6th Cir. 2023) (citing *Bell v. Cone,* 535 U.S. 685 (2002)). "While claims reviewed under *Strickland* demand a showing of both deficient performance and prejudice, *Cronic* claims arise when a defendant establishes a level of performance by trial counsel that is 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" *Id.* at 1012 (citing *Bell*, 535 U.S. at 695). Under *Chronic*, an automatic presumption of prejudice under *Strickland* applies where: (1) counsel is denied or absent at a critical stage of the proceedings; (2) counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; or (3) no attorney could provide effective assistance under the

circumstances. *Cronic*, 466 U.S. at 659–60. None of those situations apply here. Taylor has not presented any evidence that his trial counsel was "physically absent throughout an entire phase of the litigation or that a state actor prevented [Taylor's trial] counsel from adequately representing him." *See Moss*, 62 F.4th at 1012–13 (declining to extend *Chronic* to the defendant's ineffective assistance of counsel claim). And Taylor presents no evidence that his trial counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *See id.* at 1012. The record shows that Taylor's trial counsel meaningfully prepared for and participated in Taylor's trial and subjected the prosecution's case to meaningful adversarial testing, including consulting with Taylor and objecting to and cross-examining the Government's witnesses. The Sixth Circuit has stated that, under *Chronic*, "[u]ltimately, an 'attorney's failure must be complete' rather than failing to act 'at specific points[.]'" *Id.* at 1012–13. Taylor has presented no evidence satisfying that standard.

## C. The State Court Reasonably Applied the *Strickland* standard

The Court turns at last to the question of whether the Michigan Court of Appeals reasonably found that trial counsel did not perform deficiently by advising Taylor not to testify. After finding that Taylor established *Strickland* prejudice, the Court of Appeals found that Taylor did not establish deficient performance:

… [D]efendant cannot show that defense counsel's performance was objectively deficient under *Strickland*. As noted, defense counsel believed that she could still skillfully mount a consent argument without defendant's testimony. The trial court explained to defense counsel that, without evidence of consent, she could not argue consent. Defense counsel testified at the *Ginther* hearing that she "did a pretty good job presenting consent without saying the word consent." While the trial court found defense counsel's maneuverings at trial reflected a misunderstanding of the law, defense counsel "argue[d] the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case[.]" *People v. Dobek*, 274 Mich. App. 58, 66; 732 N.W.2d 546 (2007). Defense counsel fully understood that she could not say the word consent and that the consent instruction would not be given. She instead argued that the victim's voluntary actions and the surrounding circumstances showed that the prosecution had failed to prove force or coercion. In addition, despite defendant's testimony at the *Ginther* hearing, the record establishes that defendant was fully apprised that the consent instruction would not be given. The trial court meticulously informed defendant that it was his choice alone whether to testify, but that if he elected not to testify, the jury would not be given a consent instruction, and that his attorney would not be allowed to argue consent.

With the benefit of hindsight, we agree with the trial court that defendant's testimony, combined with the consent instruction, may very well have been helpful to the defense. But defense counsel's decisions are not to be viewed in this context. Defense counsel testified that she believed that defendant's testimony would do more harm than good. She testified that while defendant's written statement asserted that the sexual encounter was consensual, it had "some negatives" that would have supported the victim's testimony. Counsel was particularly concerned that defendant had admitted in his police statement that he had put his hands around the victim's throat. Defense counsel instead sought to

41

explain the victim's injuries by calling a medical expert who opined that the bruises were not from strangulation. Defense counsel also focused on the victim's credibility, her mental stability, and her use of drugs. We note that defense counsel's strategy successfully secured an acquittal on the more serious CSC-I and assault by strangulation charges.

We conclude that defense counsel's strategy was not objectively unreasonable. There is a possibility that defense counsel's efforts to seed reasonable doubt would have been undermined had the jury found defendant not credible. Defense counsel made a reasonable, calculated decision after considering the pros and cons of defendant testifying and, contrary to the trial court's finding, was not based on a misunderstanding of the law. In concluding that defense counsel was ineffective, the trial court improperly reviewed defense counsel's decision with the benefit of hindsight and second-guessed defense counsel's strategy.

*Taylor*, 2023 WL 7455543, at *4–5.[4]

At the outset it is important to note that Taylor's decision not to testify had two separate consequences. First, under the trial court's ruling, it resulted in the loss of the affirmative defense consent jury instruction and counsel's ability to explicitly assert that consent defense during closing argument. The trial court was mostly concerned with this consequence, and it found that counsel was deficient because advising Taylor not to testify caused the loss of this affirmative defense. Separately, however, counsel's advice resulted in the jury never hearing

---

[4]    The court noted that defense counsel was mistaken that Taylor could be impeached with a prior conviction, but it found that mistake was not the primary reason counsel advised Taylor not to testify. *Id.* at *5.

Taylor's version of the incident—a consequence that not only prohibited the presentation of the affirmative defense of consent, but one that also affected his ability to contest the element of "force or coercion." The Court bifurcates the two consequences because the loss of the affirmative defense did not result in an inability to present Taylor's "only" defense to the charges as the trial court found.

The section of the criminal sexual conduct statute Taylor was charged with required, among other things, that the prosecutor prove beyond a reasonable doubt that Taylor used "force or coercion to accomplish the sexual penetration." M.C.L. §§ 750.520b(1)(d)(ii) and 750.520d(1)(b). Michigan law also provides the affirmative defense of consent to certain charges of criminal sexual conduct. The defense applies where "[a] person consents to a sexual act by agreeing to it freely and willingly, without being forced or coerced…." *See* Michigan Crim. J.I. 20.27. Once the affirmative defense is presented, the prosecutor must prove an absence of consent beyond a reasonable doubt. *Id.*

Unlike the trial court, the Michigan Court of Appeals noted the overlap between a consent defense and a challenge to the element of "force or coercion." Citing *People v. Matuszak*, 263 Mich App 42, 59 (2004), the court stated that the element of "force or coercion" implicitly requires a prosecutor to prove that the complainant did not consent to

sexual penetration. *People v Taylor*, 2023 WL 7455543, at \*4. That statement is almost always true.

Consider a Venn Diagram comprised of two overlapping circles. The circle on the left consists of the set of all acts of non-consensual sexual penetration. The circle on the right consists of the set of all acts of sexual penetration accomplished through force or coercion. The area where the circles overlap would be substantial: it consists of the set of all acts where a sexual penetration is accomplished with force and coercion *and* where the acts are not consensual. These are the most typical cases of sexual assault.

The non-overlapping areas can be populated as well. The area of the left circle that does not overlap the right one consists of the set of acts where a person does not consent, and force or coercion is not used to accomplish sexual penetration. This might involve a person who is unconscious or is otherwise totally passive during non-consensual sex. By definition in such a case, since force or coercion is not present, a prosecutor would have to rely on a different section of the criminal sexual conduct statute to prosecute such an act. *See, e.g.,* M.C.L. § 750.520b(1)(h) (prohibiting sexual penetration of a physically incapacitated or helpless person). Such a situation need not be considered here because the prosecutor chose to charge Taylor with the section of the criminal sexual conduct statute that required a showing of force or coercion.

44

Turning to the area on the far right of the diagram, it consists of the set of acts where force or coercion is used to accomplish a sexual penetration, and where there is also consent. This seems to be the set of acts the officer questioning Taylor, the attorneys, and the trial court had in mind when the subject of "erotic asphyxiation" was raised. A consent instruction in such a case would be necessary to inform the jury that the presence of force or coercion is not sufficient by itself to sustain a conviction if the complainant also consented to the force being used.

Importantly here though, neither Taylor nor his counsel—not before trial nor after it—have ever asserted that Hunt consented to him using force to accomplish the sexual penetration. Taylor denied in his statement to police and during his post-conviction hearing testimony that he and Hunt were involved in that sort of encounter. Taylor does not claim that Hunt consented to being choked and forcefully penetrated—he denies he choked her and characterized his conduct in his statement as just "sexual," that he was telling her how beautiful she was, and that he did not cause her bruising. That is, this is not a case as far as Taylor has alleged that fits in the far-right area of the Venn Diagram. It is not one that would require both an instruction on the element of force or coercion and one on the affirmative defense of consent to differentiate a consensual act of sexual penetration accomplished by force from a non-consensual one that involved force.

The Court of Appeals reasonably found, therefore, that defense counsel did not operate under a misapprehension of the law. The loss of the consent instruction and the loss of counsel's ability to explicitly refer to the affirmative defense of consent was not a consequence that impacted Taylor's defense. That is, under the particular facts of this case, the argument that Taylor did not use force or coercion to accomplish the sexual penetration was coextensive with an affirmative defense of consent.

That does not mean that counsel's advice did not have an important consequence. The focus here was properly placed by the Court of Appeals on the more direct consequence of counsel's advice to Taylor not to testify—the fact that the jury never heard his account of the incident.

Considering defense counsel's testimony, the Court of Appeals reasonably found that after extensive discussion and deliberation, counsel did not perform deficiently in advising Taylor not to testify. Counsel thought that it was the preferable strategy for Taylor not to testify because she believed that it would "do more harm than good" in light of his statement to police. Counsel testified about the many aspects of Taylor's statement that she thought might have harmed the defense, and the Court quoted that testimony at length above.

These points were not insubstantial and provided the Court of Appeals with a reasonable basis for rejecting Taylor's claim. First,

counsel was concerned with the fact that Taylor admitted in his statement to the police that he put his hand around Hunt's neck multiple times but denied that it involved "erotic asphyxiation." While Taylor unsurprisingly also told police that he did not put his hand around her neck forcefully, this concession combined with the SANE nurse's testimony that Hunt's neck was bruised by being choked was obviously something that would have aided the prosecution.

The bruising on Hunt's neck nevertheless needed an explanation, and the record allows for the reasonable conclusion that defense counsel found an adequate substitute for Taylor's testimony. Instead of having Taylor testify that he did not choke Hunt, counsel presented expert testimony that the bruising was more consistent with being a hickey. That explanation was also supported by Hunt's concession on cross-examination that Taylor sucked on her neck. Moreover, counsel noted that the hickey explanation could have been undermined if Taylor testified because he said nothing about causing a hickey in his statement to the police. He said in his statement that he did not know how Hunt bruised her neck, and he wasn't the one who bruised it. That is, the hickey explanation was arguably better presented by way of the expert witness and by cross-examining Hunt than it would have been through Taylor's own testimony which could have been impeached by his police statement.

The same strategy reasonably applies to the purchase of the condoms. Taylor told police that Hunt did not come into the store with him when he purchased the condoms (though he believed she might have seen them in the car). Hunt's trial testimony was arguably more favorable than Taylor's. She testified that she did go into the store with Taylor, she acknowledged that the condoms were kept behind the counter, but she did deny seeing what Taylor bought. It was arguably easier for defense counsel to argue that Hunt knew Taylor bought condoms and therefore knew what he had in mind and agreed with it in her version.

Counsel felt similarly with respect to other aspects of Taylor's statement. Through his statement, the jury would have learned that Taylor agreed to buy weed for Hunt, that he was a much older man that frequented Bar Seven nearly every day for many years, that he was the one who suggested going up to Hunt's apartment, and that he pointed to Hunt's vagina and told her that it was "mine." By advising Taylor not to testify, defense counsel prevented what she reasonably believed to be these additional harmful aspects of his statement to police from being used against him.

Another example is defense counsel's argument that it was simply unrealistic to believe that Hunt would invite Taylor up to her apartment sometime after 2:00 a.m. just to look at her art. The suggestion was that

48

it was more likely that Hunt invited him up for sex. Yet Taylor's statement supported Hunt's account that they did go up to look at her art. Counsel was also able to impeach Hunt's credibility by eliciting concessions from her about her failure to seek help during the assault though she had many opportunities to do so.

Finally, counsel suggested that Hunt falsely accused Taylor of sexual assault because she later felt embarrassed, was humiliated that Taylor did not ask for her phone number, didn't want people at work to know what happened, and she was seeking sympathy and support from family and friends. Counsel might have felt that Hunt essentially conceded some of these points on cross-examination, for example, by admitting such things as being embarrassed by people at work finding out what happened and that she needed a police report to get out of her lease.

The safe and probably most common practice here would have been to advise Taylor to testify. But the fact that Taylor's counsel took what might be viewed as a riskier approach did not compel the Court of Appeals to find that she performed deficiently under the *Strickland* standard. Rather, the standard directs a reviewing court not to second-guess that sort of thought-out deliberate strategic decision. And "because the *Strickland* standard is a general standard, a state court has even

49

more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U. S. at 123.

Decisions about which evidence to present or which witnesses to call at trial are entitled to a "strong presumption" of reasonableness. *Richter*, 562 U.S. at 104. Defense lawyers must choose from among countless strategic options at trial, and many such decisions are particularly difficult to make because particular tactics carry the potential to both benefit and risk harm to the defense. *Id.* at 108; *see also Dunn v. Reeves*, 594 U.S. 731, 739 (2021).

Even if there is reason to think that counsel's conduct "was far from exemplary," a court still may not grant relief if "[t]he record does not reveal" that counsel took an approach that no competent lawyer would have chosen. *Burt v. Titlow*, 571 U. S. 12, 23–24 (2013). The Court cannot say that every competent lawyer would have chosen to advise Taylor to testify. Many or most competent lawyers might have, but there are reasonably debatable reasons in the record supporting the approach Taylor's counsel chose. Given the substantial deference owed, the Court will not second-guess the determination of the Michigan Court of Appeals that counsel did not perform deficiently. *See Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018) (per curiam) ("[D]eference to the state court should [be] near its apex" when it involves "a *Strickland* claim based on a motion

that turns on general, fact-driven standards….”). Accordingly, the Court **DENIES** the Petition for writ of habeas corpus.

## IV. CERTIFICATE OF APPEALABILITY

To appeal the Court's decision, Taylor must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2). The applicant is required to show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States*, 310 F.3d 900, 901 (6th Cir. 2002). Here, jurists of reason could debate the Court's conclusion that Taylor has failed to demonstrate entitlement to habeas relief. At least one jurist of reason—the trial court—found that Taylor's claim merited a new trial. Therefore, a certificate of appealability is **GRANTED**.

## V. CONCLUSION

Accordingly, the Court 1) **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus, and 2) **GRANTS** a certificate of appealability.

**IT IS SO ORDERED.**

Dated: December 16, 2025     /s/Terrence G. Berg
                             HON. TERRENCE G. BERG
                             UNITED STATES DISTRICT JUDGE